IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 9, 2024 Session

## STATE OF TENNESSEE v. JAMES KEVIN PARDUE

**Appeal from the Circuit Court for Dickson County**
**No. 2017-CR-90    Suzanne Lockert-Mash, Judge**

————————————————————

**No. M2023-00227-CCA-R3-CD**

————————————————————

James Kevin Pardue, Defendant, was charged via presentment with one count of theft of property valued at $10,000 or more but less than $60,000, and one count of home improvement fraud. After a bench trial, Defendant was found guilty of the lesser included offense of misdemeanor theft in count 1 and home improvement fraud in count 2. Defendant was sentenced to an effective sentence of six years on probation and ordered to pay $50,000 in restitution at the rate of $600 per month as a condition of his probation. Defendant appealed, arguing that the evidence was insufficient to sustain the conviction for home improvement fraud. Defendant does not challenge his conviction for misdemeanor theft. After a review of the record and the parties' arguments, we agree with Defendant that the evidence is insufficient to support the conviction for home improvement fraud. As a result, Defendant's conviction for home improvement fraud is reversed and the matter is remanded to the trial court for any further proceedings which may be necessary.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JILL BARTEE AYERS, JJ., joined.

Michael J. Flanagan, Nashville, Tennessee, for the appellant, James Kevin Pardue.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Ray Crouch, District Attorney General; and Talmage Woodall, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On February 23, 2017, the "March Term, 2017" of the Dickson County Grand Jury returned a presentment charging Defendant with one count of theft of property belonging to the residential owner, Julie Clark, valued over $10,000 but less than $60,000. On April 17, 2017, the "May Term, 2017" of the Dickson County Grand Jury returned a superseding presentment charging Defendant with one count of theft of property valued over $10,000 but less than $60,000, and one count of home improvement fraud, in violation of Tennessee Code Annotated section 39-14-154.

Defendant waived his right to a jury and the case was set for a bench trial. At trial, the residential owner testified that she was "a veterinarian for 42 years." She designed and built a veterinary clinic in Camarillo, California in 1985, and "owned two homes in California" that she improved "extensively." She moved to Tennessee in 2007, first purchasing a home in Kingston Springs in Cheatham County in 2008. She eventually purchased a mobile home in White Bluff in Dickson County and also purchased a home for each of her daughters and improved those homes. She testified that she had experience in remodeling and that her father was in construction.

When the residential owner decided to move to the White Bluff home and sell the Kingston Springs home, the residential owner looked for "individuals" to "improve both homes." She could not recall where she "found" Defendant but testified that she "called countless individuals." The residential owner asked Defendant "to replace the roof" of the White Bluff mobile home. The residential owner admitted that she had "never lived in a mobile home before" but planned to "redo every part of the house itself[,]" including "putting in new windows, a new air conditioning and heating system," "changing out the electrical," and building a "carport because [the house] didn't have a garage."

The residential owner explained that she had a difficult time finding people to work on her homes in 2015. She explained that she had an "iPool" at her home in Kingston Springs "where you can swim with a device over the top and you swim in place" and she "wanted to put that on that porch [at the White Bluff home] in the back." The residential owner testified that "no one seemed to act like that was going to be a problem" until Defendant told her the "water would be too heavy" for the porch to hold the pool. The residential owner was "impressed" and asked Defendant what he would "propose." This was around October of 2015. Defendant told the residential owner she would "have to redo this whole thing to, . . . , have the pool be able to be stable and not fall through the floor."

The residential owner introduced into evidence a "contract" for replacing the roof on the White Bluff house dated "9/22/2015." The document contained the residential owner's address and a description of the work, as follows:

Tear off 2 layers shingles
Install Arch Hickory 30 year shingles
Install 15# felt
Install new pipe flanges
Remove all trash
+ Addition cost on deck replace

The document had a subtotal of $4,800, and indicated the residential owner paid Defendant a deposit of $2,500, leaving a balance of $2,300. The document was signed by Defendant and the residential owner on "9/22/2015." A second document dated "10/1/2015" described work as "demo back of house addition" and indicated "paid in full" in the amount of $1,500. This document is only signed by Defendant. The residential owner explained that "[t]here was a porch that had been added onto the mobile home that [she] was going to have removed" and this document was signed around the time "when the plans started forming as to what [she] was going to put in its place."

In addition to the written "contracts" entered into evidence, the residential owner explained that she and Defendant entered into an oral contract to complete an addition after the demolition of the front porch. Specifically, the residential owner explained that Defendant was going to "build an enclosed porch, 50 feet by 8 feet in front of the house." The residential owner claimed that she paid for "materials and labor" in addition to "purchasing some of the material that [she] assumed would come off the balance."

The residential owner testified that Defendant did not complete the work on the roof at the White Bluff home. Specifically, she claimed that he did "half of it," which included "the front portion." Despite the residential owner's claim that Defendant did not complete the work, the residential owner continued to make payments to Defendant. According to exhibits entered at trial and the testimony of the residential owner, Defendant was paid $2,500 by check on "9/22/2015" and $8,000 by check on "10/1/15" to "purchase all of the lumber for the addition, in addition to the trusses that would have to be put at the top of the addition to make it be stable." The residential owner paid Defendant $10,000 by check and $5,600 by check both on "10/8/2015." She could not remember what those checks were for but thought that the $10,000 check was for trusses and lumber and the $5,600 check was for siding. The residential owner wrote another check to Defendant for $2,000 on "11/23/2015" and paid Defendant $8,000 in cash on "11/12/2015" "because he said his bank wouldn't accept any more checks." The residential owner next wrote Defendant a check for $450 on "12/17/2015" for "something to do with disposal" and another check for $2,250 on "12/11/2015" for "labor charges and dump fees." On "12/21/2015," the residential owner gave Defendant a check for $4,000 because Defendant "said he was

- 3 -

paying his employees, and he was going to buy Christmas presents for his son." The residential owner testified she paid Defendant a total of $43,800.[1]

The residential owner noticed problems with construction at the White Bluff home when she moved into the home in December of 2015. The residential owner explained that Defendant "was not showing up to work" between October and December of 2015 and did not give her receipts for items he purchased despite her asking "repeatedly." The residential owner never fired Defendant, instead pleading with him to come and finish the work. She "kept thinking he would finish the project." The residential owner introduced pictures of the work Defendant completed, explaining that he left wood "exposed," did things "poorly," and gave her no option but to "pay the people who came and redid everything." Eventually, the residential owner had to hire workers to correct things like the two ends of the porch that "did not meet up" and a "window [that was] cockeyed." The residential owner testified that she paid "$2320.73" to "redo the front porch."

The residential owner identified multiple photographs of work performed by Defendant at her house, including a photograph depicting "poles" that Defendant installed "to start the carport." The residential owner explained that Defendant never finished that project.

The residential owner testified that she did not get any receipts from Defendant to show what materials he bought for the project, despite asking "[m]ultiple, multiple times." According to the residential owner, Defendant "promised that he would get them together and show them to [her]." The residential owner claimed that she asked Defendant why he failed to complete the construction "more times than she [could] count." Defendant told her he "purchased all of the lumber for the project, . . . and that he had already put $40,000 of work and labor into what was at [her] house."

The residential owner asked Defendant to sign a promissory note in the amount of $25,000 on March 25, 2016, because she "had concerns that the work was not going to be completed." The residential owner explained that it was her "attempt to hopefully get some of the money back that [she] paid him." Defendant signed the note on April 14, 2016. The note stated as follows:

> This is a promissory note for $25,000 to be paid to Julie Clark by Kevin Pardue if for any reason he's unable to complete the work he's been contracted to do at [the White Bluff home]. This includes the room addition, the front porch, the carport and the walkway to the front porch.

---

[1] In our calculation, the sum of $2500 + $8000 + $10,000 + $5600 + 2000 + $8000 + $450+ $2250 + $4000 is $42,800 rather than $43,800, as claimed by the residential owner.

- 4 -

Defendant told the residential owner that "he knew that he owed [her] money, that he was going to try to pay [her] back some of the money that he had taken and not used for the project."

The residential owner recorded several telephone conversations between her and Defendant.[2] The discussion between the residential owner and Defendant in the first conversation revolved mainly around the work being done on the home in Kingston Springs. That call took place on June 20, 2016. During the call, Defendant offered to sit down with the residential owner and go over everything. Defendant expressed frustration with the residential owner because there were "[c]hanges after changes after changes" to the things the residential owner asked Defendant to do to the home. It is not clear if they were discussing the Kingston Springs home or the White Bluff home. The residential owner and Defendant argued about how long it had been since Defendant worked on the Kingston Springs home, and the residential owner claimed she had seen no receipts even though she paid Defendant $45,000. There was a discussion about change orders. At trial, the residential owner claimed she "absolutely" paid Defendant for these changes and the change orders were made "[b]efore [Defendant] did anything" at the home.

The second telephone call on June 21, 2016, began with the residential owner asking Defendant if he could finish the Kingston Springs home. There was no mention made of the White Bluff home specifically, but the residential owner mentioned that she felt like what Defendant was doing was "criminal." Defendant told the residential owner that he "bought a lot of stuff" for the project with the money she paid to him and he did not take the money and "run away with it." At one point during the conversation, Defendant stated he was "not saying there wasn't deception but [that he] want[ed] to clear it up."

During the third telephone call, which also took place on June 21, 2016, Defendant offered to get receipts for everything he had purchased and sit down with the residential owner to go over the receipts. After complaining by the residential owner that the work was not complete, Defendant complained that he ordered siding and trusses for the project and then the residential owner changed the scope of the project in an unspecified way. The residential owner expressed her desire to come to a written agreement "by next week."

The last call took place on June 27, 2016. Defendant's voice was rather garbled during this call, but the recording sounds like Defendant said he was trying to get money to bring to the residential owner by "Friday."

---

[2] When the record was transmitted to this Court, the exhibits containing the audio recordings were not included. In order for this Court to fully review the sufficiency of the evidence, we ordered the trial court to supplement the record with the audio recordings.

After introducing the telephone calls into evidence, the residential owner continued to testify about Defendant's work at the home. She explained that she had to pay someone $800 to pour footers around the concrete "because it wasn't an adequate concrete base to put the addition on." The residential owner also wrote a letter to the Attorney General as well as a letter to the Tennessee Department of Commerce and Insurance about her experience with Defendant and to initiate a complaint against Defendant. The residential owner testified that she hired Jamie McCord to complete the project at a cost of $35,110.58.

The residential owner claimed that Defendant informed her he was a licensed contractor on three separate occasions and that he refused to refund any of her money or provide her with any receipts.

On cross-examination, the residential owner admitted that she wanted a criminal prosecution and did not try to attempt to collect on the promissory note even though she "potentially" could seek payment on the note. The residential owner conceded that there was no written contract for all of the work that she added to the original agreement. Further, the residential owner admitted that she could have filed a civil lawsuit against Defendant and that all of the checks cashed by Defendant were cashed with her consent.

Defendant did not present any proof. Neither the closing arguments nor the trial court's findings are included in the record on appeal. A sentencing hearing was held on September 1, 2022. There is likewise no transcript of that hearing in the record on appeal.

The judgment forms reflect that Defendant was found guilty of the lesser included offense of misdemeanor theft in count 1 and home improvement fraud in count 2 and that the trial court sentenced Defendant to 11 months and 29 days on probation for misdemeanor theft and to six years on supervised probation for home improvement fraud. The trial court also ordered Defendant to pay $50,000 in restitution, payable at a rate of $600 per month until paid in full, as a condition of probation. The trial court denied a motion for new trial, and Defendant filed a timely notice of appeal, challenging the sufficiency of evidence for the conviction for home improvement fraud.

*Analysis*

On appeal, Defendant argues that the evidence was insufficient to support a conviction for home improvement fraud. Specifically, Defendant insists that because the "record in this case contains no evidence that any written request for refund was ever made by [the residential owner] to [Defendant]" as required by Tennessee Code Annotated

section 39-14-154(b)(1)(A), the evidence is insufficient.[3] Moreover, Defendant insists there is no evidence that Defendant deviated from or disregarded a plan or specification from a contract because the only valid contract between the parties related to the replacement of a roof on the White Bluff home. As a result, he contends the evidence is insufficient. The State, on the other hand, argues that the evidence is sufficient to show Defendant did not finish his work on the roof and left other parts of the home improvement project unfinished and in such a poor state that the residential owner had to hire someone else to complete the work.

First, we note that Defendant does not challenge his conviction for misdemeanor theft on appeal, so we will limit our analysis of the sufficiency of the evidence to Defendant's conviction for home improvement fraud. Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the convictions. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

---

[3] The actions by a home improvement services provider that constitute the offense, as stated in count 2 of Defendant's presentment, did not require proof that the Defendant failed to refund amounts within ten (10) days of acceptance of written request, either by hand delivered or by certified mail, for refund; the refusal of Defendant to accept certified mail; or the return of certified mail sent to Defendant's address. *See* T.C.A. § 39-14-154(b)(1)(A)(i-iii). Pursuant to the language of the presentment, Defendant was alleged to have violated Tennessee Code Annotated section 39-14-154(b)(2), which does not require a request for refund.

In a bench trial, the trial judge, as the trier of fact, must resolve all questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). The trial judge's verdict carries the same weight as a jury verdict. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978); *see also State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999).

Defendant was charged with home improvement fraud, a violation of Tennessee Code Annotated section 39-14-154(b)(2). At the time Defendant allegedly committed the crime and the presentment was returned, Tennessee Code Annotated section 39-14-154(b)(2)[4] made it an offense for a "home improvement services provider with intent to defraud to:"

> (2) Deviate from or disregard plans or specifications in any material respect that are contained in a contract for home improvement services. Such deviation includes, but is not limited to:
> (A) The amount billed for the home improvement services is substantially greater than the amount quoted in the contract;
> (B) The materials used in the project are of a substandard quality but the residential owner was charged for higher quality materials; or
> (C)(i) The residential owner did not provide written consent for the home improvement services provider to deviate from or disregard plans or specifications in the contract; and
> (ii) Such deviation or disregard caused substantial damage to the residential owner's property.

The statute defines a "[h]ome improvement services provider" as a person, "whether or not licensed . . . who undertakes to, attempts to, or submits a price or bid or offers to construct, supervise, superintend, oversee, schedule, direct, or in any manner assume charge of home improvement services for a fee." T.C.A. § 39-14-154(a)(3). "Home improvement services" means the "repair, replacement, remodeling, alteration, conversion, modernization, improvement, or addition to any residential property." *Id.* at (a)(2). "Home improvement services" includes any of the aforementioned actions to "driveways, swimming pools, porches, garages, landscaping, fences, fall-out shelters, and roofing." *Id.* A "[c]ontract for home improvement services" is defined as "a contractual agreement, written or oral, between a person performing home improvement services and a residential

---

[4] Defendant's presentment was filed on April 17, 2017, but was labeled "May Term 2017." Tennessee Code Annotated section 39-14-154 was amended in early May of 2017 and became effective July 1, 2017. The statute was amended again in 2018. The amendments appear to add definitions pertaining to new home construction, home buyers, new home contractors, and new home construction contracts as well as including those people and/or entities within the offense itself.

owner, and includes all labor, services and materials to be furnished and performed under such agreement." *Id.* at (a)(1).

The statute first requires proof of intent to defraud on behalf of the defendant. Intent to defraud is not defined in Title 39. As defined by statute, "Intentional" means "a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302. A defendant's "intent can rarely be shown by direct proof and must, necessarily, be shown by circumstantial evidence." *Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *see also State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010). Intent is a question of fact. *Brown*, 311 S.W.3d at 432.

The proof at trial, viewed in a light most favorable to the State, shows that the residential owner and Defendant entered into a written document to "[t]ear off 2 layers shingles[,] Install arch hickory 30 year shingles[,] Install 15# felt[,] Install new pipe flanges[,] remove all trash[,] + addition cost on deck replace." The proof shows that the residential owner paid Defendant a total of $42,800 and that Defendant did not finish the roof. The residential owner testified that she had to pay someone else to finish the roof in 2017. The only other proof as to a written document between the residential owner and Defendant appearing in the record is for Defendant to "demo back of house addition" marked "pd. in full" and signed by Defendant. The residential owner testified that she discussed various other projects with Defendant that were to be included in their written contract, including screening in the porch. The residential owner expressed displeasure in Defendant's work product, including the length of time it took him to complete various tasks. The residential owner testified that because of the shoddy construction work and/or Defendant's failure to complete the projects despite her continued payments to him, she spent a lot of money finishing or redoing the projects Defendant started at her home. There is no proof in the record as to how much money Defendant spent on materials or labor. At least one of the payments made by the residential owner to Defendant could be classified as a gift or advancement of $4,000 so that Defendant could pay his employees and buy Christmas presents for his son. During telephone conversations recorded by the residential home owner between the residential home owner and Defendant, Defendant acknowledged that he had not completed the work but gave various reasons as to his slow progress, including that he did not have a truck and/or that he had to watch his child because the child's mother was out of town.

The State cites *State v. Small*, No. E2017-01266-CCA-R3-CD, 2018 WL 2383033 (Tenn. Crim. App. May 25, 2018), *no perm. app. filed*, to support its argument on appeal that the evidence is sufficient to support the conviction for home improvement fraud. In *Small*, the defendant offered to pave a three-foot section of the victim's driveway for $6 per foot, rather than his standard price of $18 per foot. *Id.* at *1. The victim offered the

defendant a $20 bill but the defendant declined, instructing the victim to wait to pay him until he finished the job. The victim left the defendant at his house to work and when he returned, the defendant had paved a significantly larger section of his driveway. The defendant demanded $9,000 for the work. The victim was scared and offered the defendant $6,500. The defendant wanted the victim to sign a contract at that time and the victim refused. *Id.* at *2. A jury found the defendant guilty of robbery and home improvement fraud. On appeal, even though the defendant failed to support his argument about the sufficiency of the evidence with argument, this Court deemed the evidence sufficient to support the conviction because:

> the evidence shows that the victim and the Defendant entered into an oral contract for the Defendant to pave three feet at the edge of the victim's driveway for $18. Instead, the Defendant unilaterally and without the victim's consent covered a large area of the victim's concrete driveway with a thin, patchy layer of asphalt that the victim had removed shortly thereafter.

*Id.* at *4.

We find the State's reliance on *Small* misplaced. In *Small*, there was a clear intent by the home improvement specialist to defraud the residential owner as required by the statute. The proof indicated that the residential owner entered into an oral contract to pave "three feet at the edge of the victim's driveway" for a total price of $18 and instead the defendant "without the victim's consent covered a large area of the victim's concrete driveway with a thin, patchy layer of asphalt" and demanded $9,000. The proof in *Small* clearly evinces an intent to defraud. Here, on the other hand, there is no proof that Defendant intended to defraud the residential owner. To be fair, there is proof that Defendant did not complete the projects he and the residential owner agreed to, in both written and possibly oral contracts, as evidenced by the residential owner's having to hire someone else to complete the projects. There is also proof that Defendant did substandard work at the residential owner's home. However, during recorded telephone calls, Defendant offered to get receipts from purchases he made for materials and sit down with the residential owner to go over those costs. Moreover, Defendant willingly signed a promissory note agreeing to pay the residential owner $25,000 "if for any reason he's unable to complete the work he's been contracted to do at [the White Bluff home]. This includes the room addition, the front porch, the carport and the walkway to the front porch." Without proof of intent to defraud, however, the evidence is insufficient to support the conviction for home improvement fraud. Because the evidence is insufficient to sustain the conviction for home improvement fraud, we reverse the conviction.

*Conclusion*

For the foregoing reasons, Defendant's conviction for home improvement fraud is reversed.  The matter is remanded to the trial court for any further proceedings that may be necessary.


_____
TIMOTHY L. EASTER, JUDGE